213 P.3d 910 (2009)
Ken BRIGGS, Judy Robertson, Mark Johnson, Beverly Nunn, Jami Smith, Shirley Bader, Pam Zeller, Margaret ("Peggy") Clark, Odalys P. Castillo, and Valerie Bruck, Petitioners,
v.
NOVA SERVICES, a Washington nonprofit corporation, and Linda Brennan, Respondents.
No. 79615-7.
Supreme Court of Washington, En Banc.
Argued February 12, 2008.
Decided August 27, 2009.
*912 Mary R. Giannini, Attorney at Law, Spokane, WA, for Petitioners.
Louis Rukavina III, Louis Rukavina PS, Spokane, WA, for Respondents.
Gary Neil Bloom, Harbaugh & Bloom PS, Bryan Patrick Harnetiaux, Attorney at Law, Spokane, WA, Kelby Dahmer Fletcher, Peterson Young Putra, Seattle, WA, Amicus Curiae on behalf of Washington State Trial Lawyers Association Foundation.
Diana M. Kirchheim, Washington State Senate, Olympia, WA, Deborah J. La Fetra, Timothy Sandefur, Pacific Legal Foundation, Sacramento, CA, Amicus Curiae on behalf of Pacific Legal Foundation.
Kathleen Phair Barnard, Schwerin Campbell Barnard Iglitzin & Lav, Jeffrey Lowell Needle, Seattle, WA, Amicus Curiae on behalf of Washington Employment Lawyers Association.
Gary Neil Bloom, Harbaugh & Bloom PS, Bryan Patrick Harnetiaux, Attorney at Law, Spokane, WA, Kelby Dahmer Fletcher, Peterson Young Putra, Seattle, WA, Amicus Curiae on behalf of Washington State Association for Justice Foundation.
J.M. JOHNSON, J.
¶ 1 Eight employees of a nonprofit organization did not support the executive director appointed by its board. Instead, the employees made efforts to remove her from office, including sending a letter to the board of directors demanding she be fired. After the board reviewed the employees' charges and affirmed the board's support of the executive director, six of the employees quit and two were fired. The employees claim that their actions constituted "concerted activities" statutorily protected under Washington law. The employees argue that this prevents the employer from terminating any of the employees. However, we are constrained from creating broad exceptions to the general Washington rule that employers and employees can end their relationship at will. We hold that the conduct at issue here is not encompassed in the public policy of chapter 49.32 RCW protecting the employees' right to engage in concerted activities relating to the improvement of working conditions. The statutory exception to the general rule is simply not broad enough to apply here. Accordingly, we affirm the Court of Appeals, which upheld summary judgment for the nonprofit employer Nova Services and its director.

FACTS
¶ 2 Eight former employees (Employees) allege they were wrongfully terminated by Nova Services, a Washington nonprofit corporation that provides services to disabled persons. Six of the Employees held self-described management positions at Nova, including Ken Briggs, Judy Robertson, Mark Johnson, Shirley Bader, Beverly Nunn, and Jami Smith (collectively Managers). The remaining two Employees, Margaret Clark and Valerie Bruck, held nonmanagement positions.[1] All of the Employees worked under the supervision of Nova's executive director, Linda Brennan.
¶ 3 After unsuccessfully attempting to talk with director Brennan directly, the Managers sent a letter to the board of directors on April 6, 2004, regarding their ongoing concerns about director Brennan's management of the organization. The letter addressed the Managers' dissatisfaction with director Brennan's performance in the areas of leadership, administration, finance, board development, corporate culture, and community and government relations. Clerk's Papers (CP) at 73-77. The Managers requested an in person meeting with the board to elaborate on their concerns and to discuss "plans of action." CP at 76. At the end of the letter, the Managers asserted that they would collectively "leave" Nova if director Brennan terminated one or more of them for raising concerns with the board. Id.
¶ 4 Nova argues that the Managers' letter violated its internal policy barring direct employee communication with the board. However, Nova took no disciplinary action against the Managers at that time. Instead, the *913 board responded to the letter by hiring an attorney, Michael Love, to investigate the Managers' concerns. After conducting an investigation, Mr. Love determined that director Brennan had not engaged in illegal conduct. CP at 81. Love recommended that the board terminate either director Brennan or Briggs and Robertson because "personal animosity runs too deep" to allow continued working together. CP at 120.
¶ 5 The board did not follow Love's recommendation, but employed a human resource consultant, Ellen Flanigan, to mediate. After director Brennan and the Managers refused to attend mediation sessions with each other, Ms. Flanigan arranged a meeting between the Managers and the board on June 29, 2004, to discuss their dissatisfaction with director Brennan.
¶ 6 On July 12, 2004, Ms. Flanigan and director Brennan met with Bader, Nunn, Johnson, and Smith individually. Director Brennan told each that she was willing to make every effort to better communicate to address their concerns, CP at 61, and to take steps "to improve the workplace for all employees." CP at 65, 300. That same day, director Brennan terminated Briggs and Robertson for insubordination, petitioning grievances directly to the board, and for using "company time to enlist the support of fellow managers to undermine [director Brennan's] authority and position." CP at 143.
¶ 7 Upon learning of Briggs's and Robertson's termination, Bader informed director Brennan of her intent to leave Nova in response to those terminations. Bader claims that she and director Brennan agreed that she would remain at Nova until director Brennan found a replacement. Later the same day, director Brennan asked Bader to leave by the end of the day.
¶ 8 On July 15, 2004, the remaining Employees, including Bader, sent a letter to the board requesting the reinstatement of Briggs and Robertson and the firing of director Brennan. CP at 79. The letter indicated that the Employees would "walk out of Nova Services" if the board did not contact them by the end of the following day, that they would not return until their requests were met, and that the requests were "non-negotiable." Id. The board did not contact the Employees the next day. As promised, Johnson, Smith, Clark, Bruck, Zeller, and Nunn did not come to work. Director Brennan considered this action as a group resignation and began to hire replacements for all of the Employees.
¶ 9 The Employees filed a complaint against Nova on September 17, 2004, alleging wrongful "termination" in violation of public policy,[2] unlawful retaliation-wrongful discharge, negligent infliction of emotional distress, intentional infliction of emotional distress/outrage, and negligent supervision/retention. CP at 3-10. Nova filed a motion for summary judgment before either party had taken depositions. The Employees filed a motion to compel discovery and a motion for continuance based on their inability to complete discovery. After a hearing, the trial court denied the motion for continuance and granted the motion for summary judgment.
¶ 10 The Employees appealed and Division Three of the Court of Appeals affirmed on all grounds. Regarding summary judgment, the court held that the Employees had not engaged in concerted activities protected under RCW 49.32.020, because the Employees' concerns did not relate to a term or condition of employment. Briggs v. Nova Servs., 135 Wash.App. 955, 965-66, 147 P.3d 616 (2006). The court also held that the Managers were excluded from protection under RCW 49.32.020. Id. at 966, 147 P.3d 616. Chief Judge Dennis J. Sweeney dissented on grounds that the Employees' conduct was protected concerted activity, and that the managerial status of the Employees was a question of fact for the jury to determine. Id. at 967-69, 147 P.3d 616 (Sweeney, C.J., dissenting). Petitioners filed a petition for review with this court. We granted review of the summary judgment on the wrongful discharge claim. Briggs v. Nova Services, 161 Wash.2d 1022, 172 P.3d 360 (2007).

*914 ANALYSIS
¶ 11 We review an order granting summary judgment de novo. York v. Wahkiakum Sch. Dist. No. 200, 163 Wash.2d 297, 302, 178 P.3d 995 (2008). Under CR 56(c), summary judgment is appropriate if the record presents no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Oltman v. Holland Line USA, Inc., 163 Wash.2d 236, 243, 178 P.3d 981 (2008). We must view all facts, and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. Viking Props., Inc. v. Holm, 155 Wash.2d 112, 119, 118 P.3d 322 (2005).
¶ 12 Employers and employees generally can terminate their employment relationship at any time for any reason without having to explain their actions to a court. Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 226, 685 P.2d 1081 (1984). We have always made clear that the tort of wrongful discharge in violation of public policy is a narrow exception to this employment at-will doctrine.[3]Sedlacek v. Hillis, 145 Wash.2d 379, 385, 36 P.3d 1014 (2001). The exception should be applied cautiously so as to not swallow the rule. Id.
¶ 13 In order to prevail on a claim of wrongful discharge, a plaintiff must be able to show three things: (1) Washington has a clear public policy (the clarity element), (2) discouraging the conduct would jeopardize the public policy (the jeopardy element), and (3) that policy-protected conduct caused the dismissal (the causation element). Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 941, 913 P.2d 377 (1996). If these three elements are met, an employer will still prevail if it is able to offer an overriding justification for the termination decision (the absence of justification element). Id.
¶ 14 To determine whether a clear mandate of public policy is violated, we should "`inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme.'" Farnam v. CRISTA Ministries, 116 Wash.2d 659, 668, 807 P.2d 830 (1991) (quoting Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 232, 685 P.2d 1081 (1984)). We also examine prior judicial decisions that may establish a relevant public policy. Id. We have generally recognized the public policy exception when an employer terminates an employee as a result of his or her (1) refusal to commit an illegal act, (2) performance of a public duty or obligation, (3) exercise of a legal right or privilege, or (4) in retaliation for reporting employer misconduct. Gardner, 128 Wash.2d at 936, 913 P.2d 377.
¶ 15 The Employees argue that Washington has a clear public policy to engage in concerted activities. The Employees rely on RCW 49.32.020 and interpretative case law to support their conclusion. RCW 49.32.020 provides a limited but clear public policy on which a claim for wrongful discharge can be based. Bravo v. Dolsen Cos., 125 Wash.2d 745, 758, 888 P.2d 147 (1995). This statute states:
WHEREAS, . . . the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protections. . . .
RCW 49.32.020. Washington and federal law have recognized that nonunion employees have a right to engage in "concerted activities."[4]See Bravo, 125 Wash.2d at 751-52, *915 888 P.2d 147. To be protected, the concerted activities must relate to the "terms and conditions of employment," "collective bargaining" or for "other mutual aid or protections." RCW 49.32.020. As applicable to the present case, we have stated that the concerted activities must be for the purpose of improving "working conditions." See Bravo, 125 Wash.2d at 752, 888 P.2d 147 ("the court should have inquired whether the employees were alleging interference or retaliation because of activities the employees had undertaken action in concert  together  for the purpose of improving their working conditions."). The phrases "terms and conditions of employment" and "working conditions" include things like "better wages, improved medical coverage, better treatment from supervisors, [] lunch and rest breaks," Id. at 748, 888 P.2d 147; "layoffs and recalls, production quotas, and work rules," First National Maintenance Corp. v. National Labor Relations Board, 452 U.S. 666, 677, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981); on the job harassment, Trompler, Inc. v. National Labor Relations Board, 338 F.3d 747, 748 (7th Cir.2003), and even food prices at in-plant dining rooms, Ford Motor Co. v. National Labor Relations Board, 441 U.S. 488, 497, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979). The phrase does not, however, include "`managerial decisions, which lie at the core of entrepreneurial control.'" Id. at 498, 99 S.Ct. 1842 (quoting Fibreboard Paper Prods. Corp. v. National Labor Relations Board, 379 U.S. 203, 223, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring)). Managerial decisions include the choice of one's supervisor, Trompler, 338 F.3d at 749, and the wisdom of company practices, cf. First National Maintenance Corp., 452 U.S. at 676, 101 S.Ct. 2573 (the labor laws create "no expectation that the elected union representative would become an equal partner in the running of the business enterprise . . ."). Most importantly for this case, management rights continue to include the hiring and firing of management, such as the executive director here. Abilities & Goodwill, Inc. v. National Labor Relations Board, 612 F.2d 6, 8 (1st Cir.1979) ("Traditionally, the interest of the employer in selecting its own management team has been recognized and insulated from protected employee activity.").
¶ 16 Once the policy is clearly defined, it is clear Nova's firing of two employees, and its recognition that six others had quit, did not jeopardize the public policy in the statute nor were the firings caused by protected activities. The Managers wrote to the board of directors complaining that Nova's executive director, Linda Brennan, left managers to do work in isolation, failed to delegate authority well, did not hire needed staff, failed to foster open communication, and was poor at managing finances.[5] The Managers were not complaining about wages and hours or supervisor harassment nor were they requesting better benefits, more breaks, or easier work rules. These complaints simply are not about terms and conditions of employment.
¶ 17 Making the point even clearer, the Managers began their letter with this summary: "There are six widely accepted key areas of responsibility for CEOs [(chief executive officers)] of non-profit corporations. We believe the Executive Director is deficient in each of these areas, as described below." CP at 73. This is near-perfect equivalent to the United States Supreme Court's references to complaints about "`managerial decisions, which lie at the core of entrepreneurial control,'" a category that Court held wholly excluded from the definition of "terms and conditions of employment." Ford Motor Co., 441 U.S. at 498, 99 S.Ct. 1842 (quoting Fibreboard, 379 U.S. at 223, 85 S.Ct. 398 (Stewart, J., concurring)).
¶ 18 In response to the letter, Nova's board of directors acted reasonably. It hired a labor lawyer and then a professional mediator. After an investigation, the lawyer told the board that either director Brennan or two of the Managers would have to go because the three simply could not work together. The board decided that director Brennan was doing a fine job, and empowered her to make any personnel changes necessary to continue the important work of *916 this nonprofit. Director Brennan fired two of the Managers who refused to work with her. This was reasonable and in no way jeopardized the employees' right to band together for better working conditions, since they were not complaining about working conditions.
¶ 19 After director Brennan fired the two managers, six other employees wrote a second letter, this time demanding director Brennan's removal and promising to "walk out of Nova Services" if the board did not comply. CP at 79. They promised they would "not return until these requests have been met." Id. When the board did not comply, they carried out their threat. Faced with an empty office and a "non-negotiable" written promise that those employees would not return, director Brennan took reasonable action and hired new employees. Nova is, after all, a nonprofit corporation with a mission of helping disabled people. Even a minor delay in services would have major negative impacts on the lives of Nova's disabled clients.
¶ 20 Given all this, the six Employees cannot show that their termination was caused by protected activity, both because their actions did not relate to the terms and conditions of their employment, and because they were not in fact terminated. They voluntarily left and promised they would not return unless the board fired director Brennan. Since the board had just reviewed director Brennan's performance and made clear that she would remain, the condition for the Employees' promise was triggered.
¶ 21 The facts here are far different from those in one cited case to support the claim. In National Labor Relations Board v. Martin, 207 F.2d 655 (9th Cir.1953), an employee, during a dispute over bonus pay, told his employer that if he failed to hear from management in 24 hours, he was quitting. Id. at 658. The employee then went back to work and actually showed up at the factory the next day. Id. In Halstead Metal Products, Division of Halstead Industries, Inc. v. National Labor Relations Board, 940 F.2d 66 (4th Cir.1991), two of nine employees who walked out of a plant to protest a change in work schedules said they "quit" when describing what they were doing. Id. at 71. The rest simply stood outside until management came and talked with them, at which point they all returned to work. Id. In neither of these cases did the employees demand their supervisor's firing on a nonnegotiable basis or give any real indication their absence was anything more than temporary.
¶ 22 Not so with the six Employees here. They wrote a letter to the board of directors stating their intentions clearly. They demanded director Brennan be fired and the two Managers reinstated or they would leave and not return.
¶ 23 Similarly, Shirley Bader was not discharged, and so was not discharged wrongfully. Bader told director Brennan she was quitting and gave two weeks notice. Director Brennan asked if Bader could work at Nova during those two weeks without undermining her authority. Bader said she could not, so director Brennan told her that she would be paid for the next two weeks but that she should not return. Bader quit rather than being discharged, much less discharged in violation of public policy.
¶ 24 Employees in Washington do have some statutory protection of rights to band together to improve their working conditions. However, these rights do not extend so far as to supersede the employer's right to hire and retain the leadership of a company and surely do not block an employee's ability to quit. Nova did not violate a clear public policy when it fired two employees based on an undeniable conflict of personalities and stated inability to work within the company. Nor did Nova violate a clear public policy when it accepted the resignation of the other six employees who would not work for Nova's choice of an executive director.

CONCLUSION
¶ 25 We conclude that Nova did not violate a clear public policy when it fired two employees and accepted the resignation of the other six. Even in the light most favorable to the employees, the record simply does not present a genuine issue as to any material fact and Nova is entitled to a judgment as a matter of law. Therefore, summary judgment *917 was appropriate in this case. We therefore affirm the Court of Appeals decision upholding Nova Services' summary judgment motion relating to wrongful discharge and need not reach the issue of whether RCW 49.32.020 extends to protect managers who engage in concerted activities.
WE CONCUR: GERRY L. ALEXANDER, C.J., and RICHARD B. SANDERS, J.
C. JOHNSON, J. (concurring).
¶ 26 The lead opinion and the dissent conflate the analytical framework for the cause of action for violation of a group of employees to engage in "concerted activities" under RCW 49.32.020 with the analytical framework for the tort of discharge in violation of public policy. Doing so is inconsistent with our analysis in Bravo v. Dolsen Cos., 125 Wash.2d 745, 888 P.2d 147 (1995). These claims are to be treated separately. The primary and threshold issue in this case centers on whether the employees engaged in activities that constitute a concerted activity under the meaning of RCW 49.32.020. And because their activities cannot be considered "concerted activities" for purposes of RCW 49.32.020, their claims against Nova Services must fail, which the lead opinion holds. While I concur with the lead opinion's result, I cannot agree with the lead opinion's analysis in its entirety.
¶ 27 In Bravo, we did not analyze a concerted activities claim under RCW 49.32.020 together with the tort of wrongful discharge in violation of public policy. There we stated an important public policy exists, "that discharge which violates RCW 49.32.020 also gives rise to a tort of discharge in violation of a clear mandate of public policy." 125 Wash.2d at 758, 888 P.2d 147 (emphasis added). This means a party must establish that RCW 49.32.020 was violated before it can bring a claim for discharge in violation of public policy.[1] This also means the claim for discharge in violation of public policy requires discharge whereas proving an employer violated the employees' right to engage in concerted activities does not require discharge.[2] As such, these two claims are separate and distinct, so we should treat them as such.
¶ 28 Here, the lead opinion and the dissent both improperly resolve this matter. In reaching their conclusions they analyze the elements required to establish the tort of discharge in violation of clear mandate of public policy. But because violating the right to engage in concerted activities must be established before viability for the tort of discharge in violation of public policy even arises, the lead opinion's and the dissent's analysis is inconsistent with the analysis of Bravo. Generally, four situations permit a public policy tort action to sustain. One situation occurs where employees are fired for exercising a legal right or obligation (the other three situations are inapplicable to this case). See Roberts v. Dudley, 140 Wash.2d 58, 64 n. 4, 993 P.2d 901 (2000) (identifying the four situations). Put otherwise, in such a situation, the claim for wrongful discharge in violation of public policy must be predicated on a discharge that resulted from employees exercising a legal right or obligation. Here, *918 the legal right at stake is the right to engage in "concerted activities."
¶ 29 The threshold issue here, therefore, is whether the activities engaged in by the employees constitutes a concerted activity, under the statute. In Bravo, after adopting a dictionary definition for the term "concerted," we articulated the appropriate inquiry for a court to make: "whether the employees were alleging interference or retaliation because of activities the employees had undertaken action in concerttogetherfor the purpose of improving their working conditions." 125 Wash.2d at 752, 888 P.2d 147. If this question is answered in the negative, the employees did not engage in a concerted activity.
¶ 30 Here, the employees' activities were not an effort to improve their working conditions under the meaning of the statute. Rather, the employees were simply attempting as a group to leverage out someone they considered a "bad boss," which is not sufficient to establish that Nova violated the employees' right to engage in concerted activities. The employees do not allege how their working conditions were affected, within the meaning of the statute. As such, both claims filed by the employees against Nova should fail, and I agree with the lead opinion's conclusion to affirm the trial court's entry of summary judgment in favor of Nova.
MADSEN, J. (concurring).
¶ 31 The Court of Appeals and the majority have analyzed this case as involving a public policy tort claim based on termination allegedly arising from employees engaging in "concerted activities." This is not correct. The public policy of protecting employees' right to engage in "concerted activities" was mentioned for the first time in the plaintiffs' appellate brief. Although the plaintiffs framed their first claim as a cause of action for termination in violation of public policy and they asserted a second claim based upon whistleblowing, they did not identify any clear public policy involved with the right to engage in concerted activity that was violated as a result of their termination.
¶ 32 The test adopted in Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 913 P.2d 377 (1996), requires the plaintiffs to identify the public policy that was offended by their termination, and plaintiffs did not identify the right to engage in concerted activity as a public policy that was violated by their termination. Accordingly, I concur in the result reached by the lead opinion.

ANALYSIS
¶ 33 In Gardner, this court adopted Henry Perritt Jr.'s comprehensive four part test for analyzing the tort of wrongful discharge in violation of public policy. See Henry H. Perritt, Jr., Workplace Torts: Rights and Liabilities §§ 3.7-3.21 (1991). The first prong of the test requires the plaintiffs to prove the existence of a clear public policy (the clarity element). Korslund v. Dyncorp Tri-Cities Servs., 156 Wash.2d 168, 181, 125 P.3d 119 (2005). This element requires a plaintiff to establish the existence of a clear mandate of public policy and is a question of law for the court. Id. The second prong of the test requires the plaintiffs to prove that discouraging the conduct in which they engaged would jeopardize the public policy (the jeopardy element). Gardner, 128 Wash.2d at 941, 913 P.2d 377. As a part of the burden under this step, the plaintiff also must show that other means of promoting the public policy are inadequate. Korslund, 156 Wash.2d at 182, 125 P.3d 119; Gardner, 128 Wash.2d at 945, 913 P.2d 377. The next prong requires the plaintiffs to prove that the public-policy-linked conduct caused the dismissal (the causation element). Gardner, 128 Wash.2d at 941, 913 P.2d 377.
¶ 34 If the plaintiff produces the proof required, the fourth prong of Perritt's test provides that the defendant must not be able to offer an overriding justification for the dismissal (the absence of justification element). See also Collins v. Rizkana, 73 Ohio St.3d 65, 69-70, 652 N.E.2d 653 (1995) (adopting Perritt's four element test).
¶ 35 This case is here on review of a grant of summary judgment in favor of Nova Services, plaintiffs' employer. In a summary judgment proceeding, the moving party bears the initial burden of showing an absence of a material issue of fact. Young v. *919 Key Pharms., Inc., 112 Wash.2d 216, 225, 770 P.2d 182 (1989). If the moving party is the defendant and meets the requirement of this initial showing, which may be done by pointing out to the trial court that there is an absence of evidence to support the nonmoving party's case, then the inquiry shifts to the party with the burden of proof at trial  the plaintiff. Id. At this point, summary judgment should be granted in favor of the defendant if the plaintiff fails to make a showing sufficient to establish an element essential to the plaintiff's case and on which the plaintiff will bear the burden of proof at trial. Id.
¶ 36 Plaintiffs identified two concerns allegedly showing a violation of public policy. In their first cause of action they alleged:

III. FIRST CAUSE OF ACTION WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

. . . .
3.2 The conduct of Defendants as alleged in paragraphs 1.1 through 2.10 constitutes wrongful termination in violation of public policy. Plaintiffs raised concerns about health and safety of clients, wage and hour violations and other potential violations and poor practices, the existence of which violated public policy; discouraging the conduct of plaintiffs jeopardized public policy; the Plaintiffs' complaints led directly to their dismissals; and Defendants can show no other overriding justification for Plaintiffs' dismissals.
. . . .
3.4 Plaintiffs took reasonable steps to notify Brennan and Nova's Board about their concerns to no avail. Defendants failed to provide adequate preventative and remedial measures to prevent and/or stop unlawful conduct.
Clerk's Papers (CP) at 7-8 (emphasis added).
¶ 37 The facts set out in the complaint show that this first cause of action focused on the management of Nova and Executive Director Linda Brennan's performance and behavior, but the complaint does not identify any public policy, much less any statute, rule of law, or other source setting forth public policy violated by the conduct they identified.
¶ 38 In Gardner, 128 Wash.2d at 941, 913 P.2d 377, we placed the burden on plaintiffs to prove the existence of a clear public policy. This burden is necessary because the crux of the tort is the requirement that plaintiffs prove their termination violated a clear mandate of public policy. Proof of each of the other elements of the tort depends in turn on what specific public policy has been violated by the firing. In precise terms, a plaintiff must establish a "clear mandate of public policy." Korslund, 156 Wash.2d at 181, 125 P.3d 119 (emphasis added). Vague claims that "health and safety of clients, wage and hour violations and other potential violations and poor practices" violated public policy does not satisfy plaintiffs' burden to identify and prove the existence of clear public policy, which they claim has been violated by their termination.
¶ 39 At the hearing on the motion for summary judgment, the trial court gave the plaintiffs the opportunity to identify the basis for their public policy tort. First the judge stated his understanding that a violation of public policy is generally found "where employees are fired for refusing to commit an illegal act," "for performing a public duty or obligation," "for exercising a legal right of privilege," or "in retaliation, i.e. whistle-blowing." Verbatim Report of Proceedings at 27. The judge then asked plaintiffs' counsel "to explain and show why in each of these plaintiffs' cases they have adequately responded to summary judgment motions." Id. In response, plaintiffs' counsel said,
[Ms. Clark] believes there's a duty to provide a decent positive work environment for their clients. . . . [I]n this case the issue is one of what the duty of this organization [(Nova Services)] was to [sic] to the public, to the community, to its employees, and to [sic] most importantly to its clients. And I think there is a public policy issue there. I think non-profits claim charitable status, they claim exception from taxes, and they claim to have a mission and purpose that's carried out that's intended to carry out the obligations under the internal revenue code that they have.
. . . I think there are also scandals related to non-profit entities where non-profit *920 entities have essentially abrogated their responsibilities to their missions and their purpose by misusing funds, by not providing the services that their charitable purpose was set out to provide and somebody needs to call them on that and that's what these employees were trying to do.
. . . This was an effort for these [plaintiffs] to have the board of directors hear what was really going on and that I think is a matter of public policy.
Id. at 27-29.
¶ 40 Judging from counsel's argument at summary judgment and the complaint, it appears the public policy urged in plaintiffs' first claim is a broad public policy favoring efficient management of charitable organizations. Plaintiffs claimed they were terminated for complaining about Nova's executive director and her failure to appropriately serve the public and Nova's clients.
¶ 41 Counsel's argument at the summary judgment hearing was reiterated at oral argument in this court, where counsel conceded plaintiffs' complaint was not about dissatisfaction with how they were treated as employees, but rather, it was about how the organization was falling short of its duty to the public to provide appropriate services to the disabled.
¶ 42 Plaintiffs' April 6, 2004, letter to the Nova board members also expresses this "public policy" concern about mismanagement of Nova. For example, after introducing themselves to the board, the plaintiffs first point to the board was that "Nova has not. . . truly lived up to its potential. After 20 years of operations, Nova's accomplishments are rather modest. Simply put, Nova has under performed. . . . Unfortunately, Nova's CEO [(chief executive officer)] has become seriously ineffective and disengaged." CP at 73 (Aff. of Darlene Fogal, ex. 1).
¶ 43 The letter outlines the failures of Executive Director Brennan in several management areas, including Brennan's leadership style ("Effective leadership requires setting a consistently positive example by taking on the tough jobs while still delegating effectively. This is not the case at Nova."); administrative ability ("An effective, efficient administration requires the appropriate delegation of authority and responsibility. Yet, managers at Nova often find themselves involved with trivial duties and responsibilities."); financial acumen ("In a nonprofit, the ability to raise philanthropic capital is critical to fulfilling mission of the organization. The CEO should be involved in all aspects of fundraising, but she is not."); board development ("[I]t appears to us that Nova's Board is underdeveloped, undersized and kept in the dark by the Executive Director. Board development is a key area of responsibility for any Executive Director but that does not appear to be happening."); establishing corporate culture ("Open communication is not fostered at Nova. . . . Creativity and taking initiative are discouraged rather than nurtured."); and fostering community and government relations ("Nova has no public relations policies or program."). Id. at 73-76.
¶ 44 In short, the issue whether the employees were terminated in violation of a public policy regarding their rights to engaging in "concerted activities" was not asserted and was not before the trial court when it granted summary judgment to Nova.[1]
¶ 45 Moreover, even if one did conclude that the plaintiffs sufficiently identified the public policy of protecting workers' rights to engage in concerted activity, the plaintiffs also failed to establish a prima facie case with respect to the second element of the Perritt test. To meet this prong, the plaintiff must establish that discouraging the conduct *921 in which the plaintiff engaged would jeopardize the public policy they contend was violated. As we have carefully explained, as part of this requirement, the plaintiff must establish that "other means of promoting the public policy are inadequate." Korslund, 156 Wash.2d at 182, 125 P.3d 119; Hubbard v. Spokane Cy., 146 Wash.2d 699, 713, 50 P.3d 602 (2002); Gardner, 128 Wash.2d at 945, 913 P.2d 377.
¶ 46 Here, the plaintiffs made no attempt to show that the only way to promote the public policy of protecting the right to engage in concerted action was through a tort claim. For this reason as well the plaintiffs failed to sufficiently establish the prima facie case. That they failed to do so is most likely due to the fact that the right to engage in concerted action was, before raised on appeal, never identified by plaintiffs as the public policy at all. Regardless, this failure, too, means that the employer was entitled to summary judgment.
¶ 47 The dissent relies on the court's decision in Bravo v. Dolsen Cos., 125 Wash.2d 745, 888 P.2d 147 (1995), and points out that the court determined that the policy articulated in RCW 49.32.020, the "`little Norris-LaGuardia statute,'" offers broader protections than the purpose of the statute. Dissent at 921-22. It is also true that when the question of the adequacy of other protections involves only examination of existing laws, the question may be one of law for the court. Korslund, 156 Wash.2d at 182, 125 P.3d 119. However, neither of these relieves the plaintiff of the obligation to establish a prima facie case in order to withstand summary judgment.
¶ 48 First, Bravo was decided before the court adopted the Perritt test, identifying the elements of the public policy wrongful discharge tort. The determination in that case that the plaintiffs were entitled to assert a claim for wrongful discharge in violation of public policy is based on the court's conclusion that RCW 49.32.020 conferred substantive rights on nonunion employees to be free of interference, restraint, or coercion, and expressed important public policy conferring actionable rights on the employees. Bravo, 125 Wash.2d at 758, 888 P.2d 147. The court concluded from the legislature's declaration of intent and its own construction of the statute that a discharge that violated the statute also gave rise to a tort of discharge in violation of a clear mandate of public policy. Id. Thus, the court effectively equated the right to bring an action under the statute with a right to bring the tort claim. However, the court did not engage in the inquiry whether the statute's existing protections were adequate to protect the public policy at stake. At the time, that was simply not part of the analysis. Now, it is.
¶ 49 Second, while the adequacy of existing protections may in some instances be a question of law for the court, the issue here is whether summary judgment was properly granted. For this purpose, the question is whether plaintiff sufficiently countered the defendant's motion for summary judgment by presenting a prima facie case of wrongful discharge in violation of public policy.
¶ 50 I would hold that summary judgment should be affirmed, but not for the reasons offered by the majority. The court should not address the issue whether plaintiffs were discharged in violation of public policy protecting workers' rights to engage in concerted activity. That issue was never before the trial court. Even if one assumes it was, plaintiffs failed to establish a prima facie case on the elements of the cause of action, specifically on the second element.
¶ 51 I concur in the result reached by the lead opinion.
OWENS, J. (dissenting).
¶ 52 I dissent from the lead opinion today because the conduct alleged in this case is not excluded from the public policy protecting the right to engage in concerted activity. Furthermore, I think it imprudent to determine as a matter of law that the alleged concerted activity did not cause the terminations in this case. For these reasons, I would reverse the Court of Appeals and remand for further proceedings.

ANALYSIS

I
¶ 53 This court recognizes the tort of wrongful discharge in violation of public policy *922 as an exception to the at-will employment relationship. Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 935-36, 913 P.2d 377 (1996). The tort requires a plaintiff to prove three elements: "`(1) the existence of a clear public policy'" (clarity); "`(2) that discouraging the conduct in which [the employee] engaged would jeopardize the public policy'" (jeopardy); "`and (3) that the [protected] conduct caused the dismissal'" (causation). Korslund v. DynCorp Tri-Cities Servs., Inc., 156 Wash.2d 168, 178, 125 P.3d 119 (2005) (quoting Hubbard v. Spokane County, 146 Wash.2d 699, 707, 50 P.3d 602 (2002)). Upon making a prima facie showing of these elements, the burden shifts to the employer to produce some legitimate reason for the termination (justification) sufficient to create a question of fact. Id.; Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wash.2d 46, 68, 821 P.2d 18 (1991).

A
¶ 54 I agree with the lead opinion to the extent that RCW 49.32.020 creates a public policy applicable as an exception to the general at-will employment rule. However, I part ways with the lead opinion's extremely narrow interpretation of that policy. While chapter 49.32 RCW specifically deals with limitations on injunctive relief sought in labor disputes, this court has recognized that the policy articulated in RCW 49.32.020 offers broader protections than the specific purpose of the statute. Bravo v. Dolsen Cos., 125 Wash.2d 745, 755-57, 888 P.2d 147 (1995). The policy tracks the language of a federal statute, originally known as the Norris-LaGuardia Act, 29 U.S.C. § 102 (1932). See Nat'l Labor Relations Bd. v. City Disposal Sys., Inc., 465 U.S. 822, 834-35, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984). Many states, including Washington, enacted "little Norris-LaGuardia" statutes, such as RCW 49.32.020, that included the language of the federal statute. Morris v. Local Union No. 494 of Amalgamated Meat Cutters & Butcher Workmen of Spokane, 39 Wash.2d 33, 40, 234 P.2d 543 (1951) (Finley, J., dissenting). See generally Eileen Silverstein, Collective Action, Property Rights and Law Reform: The Story of the Labor Injunction, 11 Hofstra Lab. L.J. 97 (1993). Congress incorporated the same language into section 7 of the National Labor Relations Act (NLRA), 29 U.S.C. § 157. This court has referred to section 7 as the "federal analogue" of RCW 49.32.020 and has considered federal case law interpreting the meaning of concerted activities in regards to section 7 as persuasive authority in interpreting RCW 49.32.020. Bravo, 125 Wash.2d at 754-55, 888 P.2d 147.
¶ 55 Further, the phrase "or other mutual aid or protections" includes a broader purpose than formal union activities or collective bargaining efforts.[1]Eastex, Inc. v. Nat'l Labor Relations Bd., 437 U.S. 556, 565-66, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978) (recognizing "labor's cause often is advanced on fronts other than collective bargaining" and that "the language of § 7 makes clear, to protect concerted activities for the somewhat broader purpose of `mutual aid or protection' as well as for the narrower purposes of `self-organization' and `collective bargaining'"); Halstead Metal Prods. v. Nat'l Labor Relations Bd., 940 F.2d 66, 69 (4th Cir.1991) (recognizing that section 7 of the NLRA "effectively insulate[s] employees from discharge... for engaging in concerted activities for mutual aid or protection, `even though no union activity be involved, or collective bargaining be contemplated'" (quoting Joanna Cotton Mills Co. v. Nat'l Labor Relations Bd., 176 F.2d 749, 752-53 (4th Cir.1949))). Mutual aid or protection more generally refers to the right of employees to work together "to improve terms and conditions of employment or otherwise improve their lot," even outside the process of formal collective bargaining efforts. Eastex, 437 U.S. at 565, 98 S.Ct. 2505; see Bob Evans Farms, Inc. v. Nat'l Labor Relations Bd., 163 F.3d 1012, 1021 (7th Cir.1998). Indeed, not all employees have the same practical opportunities or incentives to form a union. Such unorganized employees often may require *923 the protection to engage in concerted activity more than union employees for the very reason that nonunion employees have no one to negotiate with the employer on their behalf. Halstead, 940 F.2d at 70 ("The broad protection of the [NLRA] applies with particular force to unorganized employees, who, because they have no designated bargaining representative, have `to speak for themselves as best they [can].'" (alteration in original) (quoting Nat'l Labor Relations Bd. v. Wash. Aluminum Co., 370 U.S. 9, 14, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962))). Therefore, the policy protects more than formal labor organizing activities such as designating a representative or self-organization.
¶ 56 Justice Charles Johnson incorrectly concludes that an actual violation of RCW 49.32.020 is a threshold requirement to a claim of wrongful discharge in violation of public policy. Concurrence (Charles Johnson, J.) at 917. Rather, as we recognized in Roberts v. Dudley, 140 Wash.2d 58, 993 P.2d 901 (2000), a statute may provide a clear mandate of public policy to support a wrongful discharge tort claim even where the plaintiff has no claim under the statute. Id. at 66-73, 993 P.2d 901 (recognizing public policy of Washington's Law Against Discrimination, chapter 49.60 RCW, supported wrongful discharge claim though statute provided no remedy to plaintiff). The implied cause of action arising under RCW 49.32.020 and the tort of wrongful discharge remain entirely separate, distinct causes of action. Their common ground is simply the public policy clearly set forth in the statute.

B
¶ 57 The jeopardy element requires a showing that the plaintiff engaged in conduct that "directly relates to the public policy, or was necessary for the effective enforcement of the public policy." Gardner, 128 Wash.2d at 945, 913 P.2d 377 (emphasis omitted). This court has recognized four general types of conduct involved in wrongful termination actions, including, "situations where employees are fired for refusing to commit an illegal act, for performing a public duty or obligation, for exercising a legal right or privilege, or for engaging in whistleblowing activity." Korslund, 156 Wash.2d at 178, 125 P.3d 119. Because Ken Briggs and his fellow employees (Employees)[2] have alleged conduct that falls within the scope of protected activity under RCW 49.32.020 and that such conduct directly relates to the public policy, they should have survived summary judgment.

1
¶ 58 The Employees were terminated for exercising a legal right to engage in concerted activities under RCW 49.32.020. The Employees engaged in two kinds of concerted activities: communicating with the board of directors (Board) and collectively walking off their jobs. The lead opinion incorrectly holds that neither of these activities in this context constituted concerted activities afforded protection. I dissent because in my view the Employees exercised a legal right as the law did not prohibit them from engaging in such collective actions.
¶ 59 Generally, concerted activity means "action in concert" or simply acting together. Bravo, 125 Wash.2d at 752, 888 P.2d 147. Of course, not all action taken together is protected concerted activity. See Trompler, Inc. v. Nat'l Labor Relations Bd., 338 F.3d 747, 748 (7th Cir.2003) (noting that concerted activities "obviously cannot be read literally" to condone illegal behavior). On the other hand, federal courts have protected a broad range of conduct as concerted activity and have limited protection only when the conduct is "unlawful, violent, in breach of contract, or otherwise `indefensible.'" Id. ("the mere fact that [concerted activities] are not `reasonable' does not forfeit the protection of the [NLRA]"); Wash. Aluminum, 370 U.S. at 16-17, 82 S.Ct. 1099.
*924 ¶ 60 The Employees engaged in concerted activity by acting together to communicate their concerns with the Board. Concerted activity includes listing grievances or complaints. See FiveCAP, Inc. v. Nat'l Labor Relations Bd., 294 F.3d 768, 782-84 (6th Cir.2002) (holding that circulating a petition constituted concerted activity). Nova Services claims that the Employees' letters to the Board were not protected because its internal policies forbid employees from communicating directly with the Board and that all grievances should have been presented to Nova's executive director, Linda Brennan. Clerk's Papers (CP) at 143; Br. of Resp'ts at 2. However, an internal rule or policy does not necessarily restrict an employee's right to engage in concerted activity. See Wash. Aluminum, 370 U.S. at 16-17, 82 S.Ct. 1099 (holding that the violation of a company rule does not grant the employer authority "to punish a man by discharging him for engaging in concerted activities"). Communication with Brennan about the Employees' complaints was probably futile because she refused to respond to their complaints. CP at 164, 169, 183.
¶ 61 In any event, the Board did not initially forbid the Managers from directly communicating with it. In fact, the Board responded to the Managers' first letter by allowing the Employees to address the Board in person. In addition, the Board hired an attorney to investigate the complaints and a human resource consultant to improve Brennan's relationship with the Employees. Therefore, the Board itself did not enforce its rule about prohibiting employee communication.
¶ 62 The Employees also engaged in protected activity by walking off their jobs for their mutual aid and protection. An employee walkout in protest of working conditions has long been recognized as a protected concerted activity for mutual aid or protection, even when not connected with a formal union protest. In Bravo, this court held that nonunion employees who participated in a strike after attempting to negotiate for better working conditions were engaged in concerted activity and protected for exercising a legal right under RCW 49.32.020. 125 Wash.2d at 756-58, 888 P.2d 147. In Washington Aluminum, the Supreme Court upheld the right of unorganized employees to engage in a spontaneous walkout to protest a working condition (the temperature setting in a factory) without first giving notice to their employer. 370 U.S. at 15-17, 82 S.Ct. 1099; see also Halstead, 940 F.2d at 70 ("Employees who collectively refuse to work in protest over wages, hours, or other working conditions are engaged in `concerted activities' for `mutual aid or protection' within the meaning of the [NLRA]."). Therefore, at-will employees do not lose legal protection for engaging in a collective walkout.
¶ 63 The Employees have alleged that they acted together to communicate their concerns to the Board and to collectively walk off their jobs. Based on our precedent and analogous federal case law, such conduct is included within the meaning of concerted activity as contemplated in RCW 49.32.020.

2
¶ 64 Beyond a lack of prohibition, the conduct of exercising a legal right must directly relate to the public policy. In the present context, the public policy articulated under RCW 49.32.020 protects concerted activity directly related to the "terms and conditions of employment." In Bravo, this court stated that concerted activities are protected when employees undertake action "for the purpose of improving their working conditions." 125 Wash.2d at 752, 888 P.2d 147. Such language is consistent with federal case law interpreting section 7 of the NLRA. See Wash. Aluminum, 370 U.S. at 14, 82 S.Ct. 1099 ("[T]he policy of the [NLRA is] to protect the right of workers to act together to better their working conditions.").

a
¶ 65 The lead opinion holds in part that the Employees' conduct was not protected because it did not relate to a term or condition of employment. Lead opinion at 915. I disagree. The evidence presented by the Employees demonstrates that the alleged motivation behind their concerted activities related to their dissatisfaction with Brennan's professional performance as executive *925 director of Nova. In their initial letter to the Board, the Managers criticized Brennan's management of Nova and pointed out specific concerns relating to their working conditions, including: lack of adequate supervision, CP at 73 ("leav[ing] managers to do ... work in isolation and without support"); failure to properly delegate authority, id.; failure to hire needed staff, CP at 73-74; failure to accurately apply accrued sick leave in violation of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201, CP at 74; failure to communicate with employees, id. ("Managers work in isolation without any knowledge of the overall condition of the organization."), CP at 75 ("Open communication is not fostered at Nova."); and failure to adequately manage finances, CP at 74. Based on these complaints, the Managers requested Brennan's termination.
¶ 66 These articulated concerns regarding delegation, communication, hiring of staff, and financial management related to the Employees' working conditions by their own terms. In Bravo, we recognized that "better wages, improved medical coverage, better treatment from supervisors, and lunch and rest breaks," constituted "terms and conditions of employment," for which employees were protected in attempting to negotiate with their employer. 125 Wash.2d at 748-49, 888 P.2d 147. Similarly, the accrual of sick leave and compliance with the FLSA directly relate to a term of employment. See, e.g., Nat'l Labor Relations Bd. v. Pyromatics, Inc., 677 F.2d 24, 26 (6th Cir.1982) (recognizing concerted activity by employee who circulated a petition to fellow employees for increased vacation time). Likewise, a lack of adequate supervision and lack of communication with a supervisor are analogous to "treatment from supervisors." Bravo, 125 Wash.2d at 748, 888 P.2d 147; Trompler, 338 F.3d at 749. Proper supervision, delegation of authority, and communication often can affect job performance and general satisfaction in the work environment.
¶ 67 Finally, a director's professional competency and ability to manage a company are also proper employee concerns. Federal courts have held that employee concerns regarding a supervisor's conduct and management of a company may directly relate to working conditions. See Trompler, 338 F.3d at 749 ("A complaint that a supervisor's conduct is impairing the terms or conditions of the employment of the workers whom he supervises is, however, a legitimate subject for concerted activity."); FiveCAP, 294 F.3d at 783-84 (holding that a petition seeking the removal of the executive director and financial officer for failure to properly manage a nonprofit corporation related to working conditions "[b]y its very terms"). In FiveCAP, the court held that employees of a nonprofit corporation engaged in protected conduct by circulating a petition that sought the removal of the executive director and financial officer "for their failure to manage [the corporation] properly." Id. at 783. Specifically, the court held that the failure to properly manage claims included "mishandling ... funds by cutting programs ...; terminating needed employees without replacing them; and using... funds to deter the Union's campaign." Id. The court concluded that the petition related to working conditions "[b]y its very terms." Id. The terms of the Employees' complaints also demonstrated their concerns related to working conditions under Brennan's management of Nova.
¶ 68 Brennan's own statements also acknowledge that the Employees' concerns related to improving working conditions, rather than mere personal differences. After the Board took steps to resolve the Employees' conflict with Brennan, Brennan herself expressed her commitment to address the concerns raised, which she summarized as "poor morale, staff/client ratio, pay rates, and Nova's performance management system to name a few." CP at 300. Brennan further pledged her commitment "to improve the workplace for all employees." Id. Viewing the record in this case in the light most favorable to the Employees, the lead opinion should have concluded that the alleged concerns raised by the Employees related to the improvement of their working conditions at Nova.

b
¶ 69 The lead opinion imports a line of cases to our concerted activity jurisprudence *926 that goes too far in narrowing the exception. Even if I agreed that the exception should be narrowed, the lead opinion's resulting analysis misses the question presented in this case.
¶ 70 Although courts have recognized that employees generally are not protected for engaging in concerted activity specifically for the purpose of seeking the termination of a supervisor if such decision is within the exclusive prerogative of the employer, see Bob Evans Farms, 163 F.3d at 1021 (holding that the termination of a supervisor does not relate to a term or condition of employment), an employee protest over a change in management that affects the working conditions of the employees "would in principle be protected activity," Abilities & Goodwill, Inc. v. Nat'l Labor Relations Bd., 612 F.2d 6, 9 (1 st Cir.1979).[3] Further, the court in FiveCAP held that employees of a nonprofit corporation were protected in circulating a petition that sought the removal of the executive director and financial officer for alleged mismanagement of the corporation. 294 F.3d at 783-84. Finally, depending on the level of hierarchy in an organization, lower level employees may engage with a titular head of the organization in more of a cooperative, team oriented approach. In those instances, it is entirely reasonable to describe the working relationship between the manager and employees as "related to" the working conditions of the employees.
¶ 71 I would hold that employee protests over management personnel decisions are protected when the decision relates to the employees' working conditions. The main purpose of the public policy protecting concerted activity is to give employees the ability to pressure their employer to address the terms or conditions of employment that they otherwise would have no power to change. Of course, the right to protest such management decisions does not mean that employees have the right or power to make such decisions.[4] An employee walkout can bring employee concerns about management to the attention of the employer but does not require the employer to concede authority over such matters to the employees.
¶ 72 Courts also have recognized that employees are protected in engaging in concerted activity for the purpose of seeking the reinstatement of a co-worker. See Nat'l Labor Relations Bd. v. Puerto Rico Rayon Mills, Inc., 293 F.2d 941, 946 (1st Cir.1961) ("[E]mployees are also free to use concerted activities to seek reinstatement of the employee."); Nat'l Labor Relations Bd. v. Pioneer Plastics Corp., 379 F.2d 301, 307 (1st Cir.1967) ("There is no question that employees may spontaneously agree to cease work in protest against their employer's conduct toward fellow employees and that such concerted action is protected activity."). Here, the Managers asserted in their first letter to the Board that they would collectively leave if Brennan terminated any one of them for complaining to the Board. The record indicates that the Employees walked out almost immediately after Briggs and Robertson were terminated, which raises an inference that the walkout related to the terminations.[5]
*927 ¶ 73 Based on my review of the record, I cannot conclude as a matter of law that the Employees' concerted activity did not relate to a term or condition of employment. Of course, such a conclusion does not establish that the Employees' conduct did in fact relate to their working conditions. Korslund, 156 Wash.2d at 182, 125 P.3d 119 ("[T]he question whether the jeopardy element is satisfied generally involves a question of fact."). At trial, the evidence might support a finding under the circumstances that the Employees acted out of personal dissatisfaction or animus against Brennan. In any event, such a determination presents a question of fact sufficient to overcome summary judgment.

C
¶ 74 With regard to the question of causation, the lead opinion holds that the Employees, except Briggs and Robertson, have no claim for wrongful discharge because they voluntarily resigned and therefore were not terminated at all. I disagree because the Employees have sufficiently raised a question of material fact that they did not voluntarily resign and that Brennan terminated them for engaging in protected concerted activity.

1
¶ 75 As an initial matter, the record clearly raises a question of fact regarding the termination of Briggs and Robertson. Brennan affirmatively terminated Briggs and Robertson. CP at 61. In her response to interrogatories, Brennan claimed that Briggs and Robertson were terminated, in part for "utiliz[ing] company time to enlist the support of fellow managers to undermine the Executive Director's authority and position." CP at 143. This statement itself raises a question whether Brennan terminated Briggs and Robertson for acting in concert with their fellow managers.

2
¶ 76 With regard to the remaining employees, absent Bader, the lead opinion finds the causation element lacking. Lead opinion at 916. I disagree. The termination of these employees occurred when they were replaced after walking out. Because they were exercising a protected right, subsequent displacement by Nova is causally related to their concerted activity.
¶ 77 Brennan's own understanding that the Employees voluntarily resigned does not determine the Employees' right to protection. See Puerto Rico Rayon Mills, 293 F.2d at 945-46 ("The right of employees to engage in activity guaranteed by Section 7 of the [NLRA] should not be subject to defeasance merely because the employer believes he is not violating the Act in restraining the employee in his exercise of such rights."). Brennan's state of mind only becomes relevant for consideration once the Employees meet the causation element and the burden shifts to Nova to show a legitimate reason for the termination. See Korslund, 156 Wash.2d at 178, 125 P.3d 119.
¶ 78 The fact that the Employees stated that they would not return to work until the Board met their requests does not necessarily determine that they had permanently resigned from Nova. Federal courts have refused to interpret such words in isolation and have rejected them as justification for an employer's decision to terminate or replace workers who engage in a walkout. See Halstead, 940 F.2d at 70 ("An employee's use of the word `quit' in a mass walk out does not always mean that the employee intended to terminate his or her employment."). For example, in Nat'l Labor Relations Bd. v. Martin, 207 F.2d 655, 658 (9th Cir.1953), the court rejected the employer's claim that the employee voluntarily resigned after claiming he "was quitting" if his supervisor did not respond in 24 hours to his and fellow employees' demands regarding bonus pay. The court noted that when the employee left work that day, he did not follow the "customary procedure" (taking his tools with him) for a permanent resignation. Id. The court concluded that the employer's decision to treat *928 the employee's statement as a permanent resignation amounted to a retaliatory discharge for participating in concerted activities. Id. at 659. Likewise, in Halstead, the court determined that nine employees who walked off their jobs had not resigned, even though they indicated that they would not return to work until they could talk to management and two of them expressed that they were quitting. 940 F.2d at 70-71. The court considered the employees' conduct in the context of their labor dispute, including the fact that "the employees did not submit termination notices or ask for final paychecks" at the time they left work. Id. at 71. The court also noted that "it is highly unusual for nine employees to terminate their employment at the same time, and it is more likely that the employees had banded together to protest [working conditions]." Id. These courts recognize that statements made during a strike or walkout raise questions of fact regarding the employment status of the employee and must be viewed in the context of the ongoing labor dispute.
¶ 79 I find this line of reasoning compelling. An employee does not lose his or her right to engage in collective activity solely by stating his or her intent to quit or leave during the course of a walkout. An employee's stated intention to quit or refusal to return to work during a walkout certainly is a factor in determining whether the employee has permanently resigned. However, courts must also consider whether the employee simply made such a statement as part of an overall effort to improve his or her labor conditions. See id.
¶ 80 In this case, the walkout occurred immediately after Brennan fired Briggs and Robertson allegedly for insubordination and for gathering support from fellow workers. From these facts I assume, for purposes of summary judgment, that the Employees reasonably inferred from the terminations that any further attempt to engage in concerted activity against Brennan would subject them to termination for the same reasons. In other words, the termination of Briggs and Robertson effectively cut off the ability of the remaining Employees to engage in protected concerted activity for the improvement of their working conditions without risking their own jobs. The walkout remained the last option they had to protect themselves against Brennan's alleged retaliation. While the Employees stated their intent not to return to work unless certain requests were met, they did not state that they would permanently resign from Nova. Furthermore, the record does not indicate that the Employees followed the customary procedure for resigning, such as cleaning out their desks or completing the appropriate paperwork as to indicate a permanent resignation. Id.; Martin, 207 F.2d at 658.
¶ 81 My colleague Justice Charles Johnson acknowledges that this court has opined that constructive discharge may support a wrongful discharge claim. Concurrence (Charles Johnson, J.) at 917 n. 2. In Korslund, we recognized that we never considered or rejected a constructive discharge theory. 156 Wash.2d at 179, 125 P.3d 119. The Korslund plaintiffs alleged that they were forced to take extended medical leave because of actions taken against them for engaging in protected activity. Id. at 176, 125 P.3d 119. We recognized such allegations may support a claim for wrongful discharge: "Deliberately creating conditions so intolerable as to make the employee so ill that he or she must leave work permanently is functionally the same as forcing the employee to quit." Id. at 180, 125 P.3d 119 (also noting, "[t]he leave must be, in other words, comparable to termination of employment"). I see no reason to discard the Korslund dicta as an incorrect statement of law; rather, I believe it to accurately represent how this court should and would analyze a wrongful termination by constructive discharge claim.
¶ 82 Whether the employees had been terminated was the threshold question in Korslund; had we held to the contrary, it would not have been necessary to address further the elements of the tort of wrongful discharge as we did. Id. at 181-82, 125 P.3d 119. Thus, constructive discharge, if proved, suffices as discharge for purposes of the public policy tort.
¶ 83 The fact that the Employees requested the reinstatement of fellow workers and the termination of Brennan indicates that the *929 walkout was a continuation of their ongoing efforts to effectuate some change in their own working conditions rather than simply to abandon their jobs. The Employees' statement that these requests were nonnegotiable is consistent with the purpose of a walkout, which by its very nature is a tactic used by employees when negotiations have broken down. Indeed, from the Employees' perspective, previous attempts to negotiate with the Board led to Briggs's and Robertson's termination.
¶ 84 Ultimately, whether an employee who engages in a walkout has voluntarily resigned presents a question of fact that must be determined in light of the circumstances of each case. The right to walk out of a job is not unlimited and must relate to some concerted activity for the purpose of improving working conditions. However, we believe that the reasonableness of the action and the employer's response will largely turn on the facts of each case. Having recognized that walkouts and strikes fall within the scope of concerted activity protected by RCW 49.32.020, we cannot determine as a matter of law that the Employees were not protected in walking off their jobs.

3
¶ 85 Employee Bader's situation requires specific attention regarding causation because she technically did not participate in the walkout. After Briggs and Robertson were terminated and before the remaining Employees walked out, Bader alleged that she informed Brennan of her intent to resign "if things were not going to get better at Nova." CP at 160. According to Bader's affidavit, Brennan asked Bader if she would "stay around long enough that she could replace me." Id. Later that day, Bader alleged that Brennan asked Bader if she could be personally loyal to Brennan before she left. Id. Bader responded that she could be loyal to Nova but not to Brennan personally. Id. At this point, Bader alleges that Brennan asked her to leave by the end of the day. Id.
¶ 86 Bader's affidavit raises a question of fact whether she was terminated or voluntarily resigned from Nova.[6] According to Bader, she only indicated her intent to leave Nova at some indeterminate time in the future, and it was Brennan who affirmatively and immediately terminated her employment. Furthermore, she told Brennan that she intended to leave because of the lack of improved working conditions at Nova. As with the other Employees, this evidence raises a genuine question of fact as to whether Brennan terminated Bader for engaging in concerted activities with the other Employees.

CONCLUSION
¶ 87 This court has expressly recognized a public policy protecting the right of nonunion employees to engage in concerted activities for the purpose of improving working conditions. The record in this case presents a genuine question of material fact as to whether the Employees' concerted activities directly related to the improvement of their working conditions. Furthermore, the record also presents a question of fact as to whether Brennan terminated the Employees for engaging in protected concerted activity or whether some of the Employees voluntarily resigned. Finally, RCW 49.32.020 does not expressly exempt managers or supervisors from the right to engage in concerted activities. For these reasons, I would reverse the Court of Appeals and remand to the trial court for further proceedings.
WE CONCUR: TOM CHAMBERS, MARY E. FAIRHURST and DEBRA L. STEPHENS, JJ. *930
NOTES
[1] Odalys Castillo stipulated to the dismissal of her claims. Clerk's Papers (CP) at 355. Pam Zeller apparently abandoned her claims as well. Appellants' Opening Br. at 6.
[2] We refer to the tort as "wrongful discharge in violation of public policy." Korslund v. Dyncorp Tri-Cities Servs., Inc., 156 Wash.2d 168, 178, 125 P.3d 119 (2005).
[3] We recently outlined the basic principles of wrongful discharge in violation of public policy in Danny v. Laidlaw Transit Services, Inc., 165 Wash.2d 200, 193 P.3d 128, 131-32 (2008).
[4] Because of the similarity between the text of RCW 49.32.020 and 29 U.S.C. § 157, federal law has been found persuasive by this court. Bravo, 125 Wash.2d at 754-55, 888 P.2d 147.
[5] They also complained that she improperly accrued sick leave in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, but that would give rise to a complaint under that law, not one for wrongful discharge.
[1] This is not to say that an employee must have a remedy under the statute to bring their claim for wrongful discharge in violation of public policy. But the terminated employee must first prove that a public policy was violated, which thereby rendered such termination wrongful. Roberts v. Dudley, 140 Wash.2d 58, 60, 993 P.2d 901 (2000). As such, before the employees in this matter can bring a claim for wrongful discharge in violation of public policy, they must first prove that their right to engage in concerted activities (i.e., the public policy identified in RCW 49.32.020) was violated.
[2] Washington State Trial Lawyers Association Foundation, in its amicus brief, properly points out the concerted activities claim is broader in scope than the wrongful discharge claim. A concerted activities claim enables employees to prevail if they show, among other things, they were restrained, interfered with, or coerced. RCW 49.32.020. But to bring the wrongful discharge claim there must be an actual discharge, under current case law; constructive discharge is arguably sufficient. Bravo, 125 Wash.2d at 758, 888 P.2d 147 (requiring discharge to establish a prima facie action for the tort of wrongful discharge in violation of public policy); but see Korslund v. Dyncorp Tri-Cities Servs., Inc., 156 Wash.2d 168, 180-81, 125 P.3d 119 (2005) (discussing "constructive discharge" positively, but not reaching the issue).
[1] In contrast, to the extent that plaintiffs identified a clear public policy, they did so in the second claim in their complaint where they asserted they had been unlawfully terminated as "whistleblowers." ("The substantial factor in deciding to terminate Plaintiffs was their actions as `whistleblowers' in complaining to the Board and to outside agencies of Defendants actions in violation of public policy." CP at 8). Also, some of the language in plaintiffs' first claim can be read to suggest that they were terminated because they complained about unlawful conduct, i.e. because they were "whistleblowers," however, their second claim more clearly identifies this theory. Indeed, in the final paragraph of their April letter, plaintiffs summarize: "Please realize that we are essentially `whistle blowing' by sharing this information with you." CP at 76. Plaintiffs have not challenged the trial court's dismissal of their whistleblowing claim.
[1] "Collective bargaining" is as a term of art in the context of labor law, which generally refers to an employer's statutory obligation to formally negotiate with employees through a designated representative on certain topics. Patrol Lieutenants Ass'n v. Sandberg, 88 Wash.App. 652, 656, 946 P.2d 404 (1997).
[2] The Employees are petitioners Ken Briggs, Judy Robertson, Mark Johnson, Shirley Bader, Beverly Nunn, Jami Smith, Margaret Clark, and Valerie Bruck. Briggs, Robertson, Johnson, Bader, Nunn, and Smith held self-described management positions at Nova and are referred to collectively hereinafter as "Managers." Clark and Bruck held nonmanagement positions. The two remaining petitioners, Odalys Castillo and Pam Zeller, are not parties to this appeal. See lead opinion at 912 n. 1.
[3] The lead opinion cites to Abilities & Goodwill for the proposition that collective requests to hire or fire management fall outside of the concerted activities exception. Lead opinion at 914. However, the court in Abilities & Goodwill adopts a multifactored approach that recognizes, among other factors, the dichotomy between protests regarding upper management and lower level supervisory management. Because Brennan was the executive director, such a balancing test may tip in Nova's favor. However, such a holding would require an analysis of the workplace structure beyond that provided in the lead opinion.
[4] Ultimately, this case is about whether the Employees are without recourse for being terminated for engaging in this protest, not whether or not employers must act on the protestations of their respective employees' concerns about members of management. Boards of directors are free to ignore the protests, reject the underlying requests or demands, or even discharge the employees, but if and when boards choose the latter option, they will potentially be liable for wrongful termination under the concerted activity exception.
[5] In their memo in opposition to summary judgment, the Employees contend that they walked out to protest working conditions and expressly deny specifically protesting the termination of Briggs and Robertson. CP at 201. However, in the first letter to the Board, the Managers stated that they would walk out if Brennan retaliated against any one of them for expressing their concerns. Furthermore, the second letter to the Board expressly demanded Briggs's and Robertson's reinstatement. As such, the protected nature of the conduct raises a question of fact.
[6] Generally, the nonmoving party cannot rely solely on "speculation, argumentative assertions that unresolved factual issues remain, or on having its affidavits considered at face value." Retired Pub. Employees Council of Wash. v. Charles, 148 Wash.2d 602, 612, 62 P.3d 470 (2003). However, Bader's affidavit relies on personal knowledge of a critical event in this case. As such, her affidavit presents arguable facts, not merely unsupported conclusions.