[No. 67030-1-I.   Division One.   May 14, 2012.]

REYNOLD QUEDADO, *Appellant*, v. THE BOEING COMPANY, *Respondent*.

*Bryan P. Coluccio* (of *Cable Langenbach Kinerk & Bauer LLP*), for appellant.

*James Sanders* (of *Perkins Coie LLP*) and *Kristina S. Bennard* (of *The Boeing Company*), for respondent.

¶1 BECKER, J. — Appellant Reynold Quedado, a Boeing employee, was demoted out of management for exerting influence to get two of his relatives hired. In this action for wrongful demotion and breach of implied contract, Quedado contends the Boeing "Code of Conduct" and two company policy documents contained enforceable promises concerning how investigations of employee conduct are to be investigated and how discipline is to be imposed. The record discloses no evidence of an implied contract modifying the at-will employment relationship and no promises of specific treatment in specific situations. The trial court properly granted summary judgment dismissal of Quedado's claim.

## FACTS

¶2 Because we review summary judgment granted in Boeing's favor, we consider the facts in the light most favorable to Quedado. *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 698, 952 P.2d 590 (1998). There is no dispute as to the material facts set forth below.

¶3 Quedado began working at Boeing as an engineer in 1980. He was promoted into management in 1994 and into senior management in 1997. Quedado maintained a clean disciplinary record until the events underlying this case.

¶4 It was an established company policy that the hiring, transfer, or placement of relatives of Boeing employees

"must not result in actual or perceived preferential treatment, improper influence, or other conflict."[1] Management employees had special responsibilities to take action to address potential conflicts and to seek assistance with understanding the requirements of the rules, where necessary.

¶5 In early 2006, Quedado came under suspicion of improperly using his influence to get his second cousin and his nephew hired at Boeing. An investigation ensued over a period of approximately eight weeks. The lead investigator interviewed seven employees involved in the hiring or placement of the two relatives. The investigator also interviewed Quedado. The investigator reported that Quedado had improperly used his influence to obtain positions for his relatives, and when questioned he was not forthcoming about his family relationships.

¶6 As a result of the investigation, Quedado was demoted to a nonmanagement position in a different work unit. This meant a reduction in wages.

¶7 Quedado filed this suit on May 11, 2009. The trial court granted Boeing's motion for summary judgment on March 25, 2011. This appeal followed.

## SUMMARY OF RELEVANT LAW

■ ■ ¶8 Generally, an employment contract that is indefinite as to duration is terminable at will by either the employee or employer. *Roberts v. Atl. Richfield Co.*, 88 Wn.2d 887, 894, 568 P.2d 764 (1977). In Washington, an employer's employment policies and procedures can alter the employment at-will relationship and form either a binding implied employment contract or create enforceable promises regarding terms of employment. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 104, 864 P.2d 937 (1994). "This rule rests on the principle that by using a manual or

---

[1] Clerk's Papers at 105 (PRO-6477, at 10), Clerk's Papers at 113 (PRO-58, at 3).

handbook, an employer secures promises from the employees which create a loyal, orderly and cooperative work force, such that the employer should be equally bound to its promises to the employee, which are designed to create an atmosphere of job security and fair treatment." *Drobny v. Boeing Co.*, 80 Wn. App. 97, 101, 907 P.2d 299 (1995) (citing *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 229-30, 685 P.2d 1081 (1984)). By making written promises, the employer creates an expectation in the employee "and thus an obligation of treatment in accord with those written promises." *Thompson*, 102 Wn.2d at 230.

¶9 An employer may be bound by its written materials in either of two ways. *Duncan v. Alaska USA Fed. Credit Union, Inc.*, 148 Wn. App. 52, 60, 199 P.3d 991 (2008). First, the written materials may create an implied contract modifying the at-will relationship. Second, the written materials may create an atmosphere of job security and fair treatment with promises of specific treatment in specific situations, whereby an employee is induced to remain on the job and not actively seek other employment. *Duncan*, 148 Wn. App. at 60; *Thompson*, 102 Wn.2d at 230. The second avenue is based on an equitable theory of justifiable reliance. *Korslund v. DynCorp Tri-Cities Servs., Inc.*, 156 Wn.2d 168, 185, 125 P.3d 119 (2005).

¶10 To prove the existence of an implied contract, the employee must establish the basic requisites of contract formation. These are an offer of new or different employment terms, acceptance, and consideration. *Thompson*, 102 Wn.2d at 228; *Kuest v. Regent Assisted Living, Inc.*, 111 Wn. App. 36, 51, 43 P.3d 23 (2002), *review denied*, 149 Wn.2d 1023 (2003). These elements may be established by showing that the employer provided a policy manual and explained it to the employee, the employee signed the policy and agreed to abide by it, and the employee continued to work for the employer. *Gaglidari v. Denny's Rests., Inc.*, 117 Wn.2d 426, 433, 815 P.2d 1362 (1991).

¶11 To establish an equitable reliance claim, the employee must prove

(1) that a statement (or statements) in an employee manual or handbook or similar document amounts to a promise of specific treatment in specific situations, (2) that the employee justifiably relied on the promise, and (3) that the promise was breached.

*Korslund*, 156 Wn.2d at 184-85.

¶12 If the written terms amount only to "general statements of company policy," then the document does not create an implied contract modifying the at-will relationship, nor does it support an equitable claim of reliance on a specific promise. *Thompson*, 102 Wn.2d at 231; *Drobny*, 80 Wn. App. at 101. "Only those statements in employment manuals that constitute promises of specific treatment in specific situations are binding." *Stewart v. Chevron Chem. Co.*, 111 Wn.2d 609, 613, 762 P.2d 1143 (1988). An employer may also escape obligation if it states "in a conspicuous manner" in the written materials that "nothing contained therein is intended to be part of the employment relationship" (i.e., the materials contain a conspicuous "disclaimer"), or if the employer specifically reserves a right to modify the policies, or writes them "in a manner that retains discretion to the employer." *Thompson*, 102 Wn.2d at 230-31.

¶13 Whether or not an employer has made a promise specific enough to create an obligation and to justify an employee's reliance thereon is a question of fact. *Burnside*, 123 Wn.2d at 104-05. However, "if reasonable minds cannot differ as to whether language sufficiently constitutes an offer or a promise of specific treatment in specific circumstances, as a matter of law the claimed promise cannot be part of the employment relationship." *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 522, 826 P.2d 664 (1992).

## BOEING'S DOCUMENTS

¶14 Quedado contends his demotion either violated an implied contract that arose from the Boeing Code of Con-

duct and two more detailed documents, PRO-1909 and BPI-2616, or violated specific promises contained in those documents.

¶15 The code is a one-page document that every employee must sign every year, certifying understanding and compliance. It begins with a general statement of high ethical aspirations:

> The Boeing Code of Conduct outlines expected behaviors for all Boeing employees. Boeing will conduct its business fairly, impartially, in an ethical and proper manner, and in full compliance with all applicable laws and regulations. In conducting its business, integrity must underlie all company relationships, including those with customers, suppliers, communities and among employees. The highest standards of ethical business conduct are required of Boeing employees in the performance of their company responsibilities. Employees will not engage in conduct or activity that may raise questions as to the company's honesty, impartiality, reputation or otherwise cause embarrassment to the company.

The code then enumerates eight specific employee obligations and encourages employees to report violations. It concludes by stating, "Every employee has the responsibility to ask questions, seek guidance and report suspected violations of this Code of Conduct. Retaliation against employees who come forward to raise genuine concerns will not be tolerated."

¶16 The code makes no "offer" of new employment terms or entitlements. Nor does it extend any specific promises as to how employees will be treated in specific situations. The statement that Boeing will conduct its business fairly, impartially, and in full compliance with all laws and regulations can be read only as a general promise that fits squarely within what the *Thompson* court called "merely . . . general statements of company policy and, thus, not binding." *Thompson*, 102 Wn.2d at 231. In *Thompson*, the Supreme Court examined a similar statement in an employee manual, stating that "terminations will be handled in a fair,

just and equitable manner." *Thompson*, 102 Wn.2d at 224. The court held that this language "merely implements a company policy to treat employees in a fair and consistent manner" and did not constitute a specific, binding promise. *Thompson*, 102 Wn.2d at 224; *see also Hill v. J.C. Penney, Inc.*, 70 Wn. App. 225, 235, 852 P.2d 1111 (rejecting theory that employer's "general policy of fair treatment" modified the employment at-will relationship because "general policies and subjective beliefs do not modify an at-will employment contract"), *review denied*, 122 Wn.2d 1023 (1993). Boeing's code was likely intended to foster a general "atmosphere of fair treatment" for Boeing employees. *Thompson*, 102 Wn.2d at 229. But such an "atmosphere" is not enough to modify the at-will relationship. *Bulman v. Safeway, Inc.*, 144 Wn.2d 335, 343, 27 P.3d 1172 (2001). The Boeing Code of Conduct does not provide a basis for this lawsuit.

¶17 Boeing also maintained an array of company-wide procedures (PROs) and business process instructions (BPIs). Quedado contends that statements contained in PRO-1909 and BPI-2616 constituted an offer or a promise of specific treatment in specific circumstances. PRO-1909 is the "Administration of Employee Corrective Action" policy. Associated with it is BPI-2616, "Employee Corrective Action Guidelines." These two documents set forth rules and procedures governing investigations of employee misconduct and a matrix of guidelines for selecting an appropriate discipline. In Quedado's management role, he received training in the content and application of these two documents, and he participated in the investigation and discipline of subordinate employees using the corrective action framework created by the two documents.

¶18 Contrary to Quedado's argument, the two documents he attempts to rely on vest ultimate discretion in Boeing as to how investigations will be carried out and what discipline will be meted out. For example, Quedado contends his demotion on a first offense violated a promise

of progressive discipline with warnings or suspensions imposed before demotion. But neither document makes such a promise. BPI-2616 states, "Generally, management should follow a progressive ECA [Employee Corrective Action] path; however, some acts of unacceptable conduct are so serious as to warrant severe corrective action upon the first known offense." PRO-1909 similarly states that "some acts of unacceptable conduct are so serious as to warrant severe corrective action upon the first known offense." Both documents specifically caution that management employees are held to a higher standard of conduct and may be subject to more severe levels of corrective action. No language promises that the company will adhere to the matrix of recommended disciplinary sanctions in BPI-2616. Rather, the matrix is described by BPI-2616 as simply "a tool that will assist the manager and the Human Resources organization" in determining appropriate discipline "given the specific facts of incidents." These statements demonstrate that the disciplinary matrix is "merely a guideline for management." *Stewart*, 111 Wn.2d at 614.

¶19 Where an employment manual gives the employer discretion in applying the discipline procedures, "courts have held as a matter of law that the manual does not provide a promise of specific treatment in a specific circumstance." *Drobny*, 80 Wn. App. at 103. This case is like *Drobny*, which involved a claim against Boeing based on written policies providing that the discipline process was "to be governed by progressive discipline," and would "normally" begin with a written warning, but "acts warranting severe discipline" might justify dismissal or suspension. *Drobny*, 80 Wn. App. at 102-03. These statements were held not to be specific promises. "Boeing retained discretion to determine on a case-by-case basis whether conduct would be deemed serious enough to merit dismissal without recourse to progressive discipline." *Drobny*, 80 Wn. App. at 104. The same is true here.

¶20 Quedado makes much of the statement in BPI-2616 that the disciplinary guidelines "must be applied consis-

tently throughout the workplace." In response to a discovery request, Boeing identified two other employees as having been disciplined for similar hiring policy violations, yet their only discipline was five days' leave without pay. Quedado argues that Boeing's decision to demote him violated an enforceable promise of consistent discipline. But read as a whole, BPI-2616 leaves the company with ample discretion to impose varying discipline, depending upon how its decision makers view the circumstances of each individual case.

¶21 Quedado's manager, Garry Totman, admitted he had only "minimal" involvement in the investigation and discipline decision-making process that led to Quedado's demotion. Quedado contends BPI-2616 promises that an employee's manager will be involved in all steps of the investigation and corrective action process. BPI-2616 makes no specific promises regarding the extent of a manager's involvement. It includes the manager as one of three roles relevant to each step of the disciplinary process, but it does not expressly require the manager's involvement at any given stage, nor does it specify any extent of involvement.

¶22 Similarly, we find no enforceable promise in language found in both documents emphasizing that investigations and corrective actions should be based on facts as opposed to opinions, hearsay, and personal feelings. These are guidelines for the benefit of personnel who are in charge of corrective action. They are too general to create a promise to employees that opinions, hearsay, and personal feelings will never play a part in the company's disciplinary process.

¶23 Nor did the two documents create an implied contract. On the first page of both is a conspicuous disclaimer of contractual rights. In a section titled "Purpose/Summary," BPI-2616 provides:

> This process instruction does not constitute a contract or contractual obligation, and the company reserves the right, in its sole discretion, to amend, modify, or discontinue its use

without prior notice, notwithstanding any person's acts, omissions, or statements to the contrary.

PRO-1909 contains nearly identical language.

¶24 "It is generally recognized that an employer can disclaim what might otherwise appear to be enforceable promises in handbooks or manuals or similar documents." *Swanson*, 118 Wn.2d at 526.

> At a minimum, the disclaimer must state in a conspicuous manner that nothing contained in the handbook, manual, or similar document is intended to be part of the employment relationship and that such statements are instead simply general statements of company policy.

*Swanson*, 118 Wn.2d at 527 (citing *Thompson*, 102 Wn.2d at 230); *see also Birge v. Fred Meyer, Inc.*, 73 Wn. App. 895, 898-99, 872 P.2d 49, *review denied*, 124 Wn.2d 1020 (1994). Boeing's disclaimers met the minimum requirement described in *Swanson*.

¶25 A disclaimer "must be effectively communicated to an employee in order to be effective." *Swanson*, 118 Wn.2d at 519. Quedado declares that he never signed a disclaimer in any Boeing employment policy and contends the disclaimer was therefore ineffective. But he does not claim he was unaware of the disclaimers. Indeed, he claims to have known enough about the specific contents of the two documents to rely on them. It is not plausible that he was aware of what the documents said about how to conduct an investigation and take corrective action yet remained unaware of the conspicuous disclaimer.

¶26 A disclaimer may be negated by later, inconsistent representations by the employer. *Swanson*, 118 Wn.2d at 532. Quedado contends managers were told the procedures set forth in BPI-2616 and PRO-1909 documents were mandatory. Even so, the documents do not contractually modify the at-will employment relationship Quedado had with Boeing because they do not offer new employment terms or make new promises of specific treatment. Examples in

*Swanson* of subsequent representations by an employer that could negate a disclaimer included employment manuals that provided " *'exclusive* lists of reasons for discharge' "; a "listing of detailed procedures and *specific* grounds for discharge"; and "detailed disciplinary policies, including descriptions of certain conduct for which termination *would be immediate* and other circumstances in which warnings *would be provided* before discharge." *Swanson*, 118 Wn.2d at 532-34 (emphasis added) (quoting Michael A. Chagares, *Utilization of the Disclaimer as an Effective Means To Define the Employment Relationship*, 17 HOFSTRA L. REV. 365, 392-93 (1989)). The directives in PRO-1909 and BPI-2616 retain too much discretion in the hands of the company to be construed as negating the disclaimers found in those documents.

¶27 In summary, the facts here can lead only to the conclusion that Boeing intended BPI-2616 and PRO-1909 to guide the employment relationships, not to create a binding process through a set of promises.

¶28 Without evidence of a promise that modified Quedado's at-will employment status, his theories of breach of implied contract and equitable reliance on a promise of specific treatment must fail. Summary judgment was properly granted to Boeing.

¶29 Affirmed.

SPEARMAN, A.C.J., and LAU, J., concur.

Review denied at 175 Wn.2d 1011 (2012).