# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PATRICK KELLEY, an individual,<br><br>Appellant,<br><br>v.<br><br>THE BOEING COMPANY, a Delaware corporation; and BRIAN BAIRD, an individual,<br><br>Respondents. | No. 82010-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

APPELWICK, J. — Patrick Kelley argues the trial court erred in dismissing his wrongful discharge claim. He alleges that Boeing wrongfully discharged him after he participated in an investigation based on his employees' complaints about their bonuses and annual review. He sought to establish wrongful termination by showing his firing contravened a clear mandate of public policy. Kelley failed to establish the necessary legal error. We affirm.

## FACTS

Patrick Kelley began working at The Boeing Company in 1986.[1] In June 2014 he became a director of supplier performance.

In 2017, Gabrielle Wolfe was supporting Kelley as part of her role as a staff analyst, and her cubicle was located outside his office. In March 2017, Wolfe had reported to the Boeing Ethics and Business Conduct Department (Ethics) that a

---

[1] Although it is clear from the record that Boeing employed Kelley, there is no evidence of a written employment contract. Additionally, Kelley does not allege that he is a member of a union or a member of a protected class.

non-Boeing employee had taken photos while in Kelley's office, a policy violation. Months after this complaint, on August 10, 2017, Kelley called Wolfe into his office and told her that her career would be damaged if she complained to Ethics again. After that conversation, Kelley often commented that he did not trust Wolfe because of her Ethics report and that he did not want her sitting outside his office. Wolfe's job assignment was changed and her work area was moved. Wolfe felt that her changed work assignment and Kelley's behavior toward her resulted from her reporting his behavior, so she filed a retaliation complaint with Ethics.

In late 2017, Kelley conducted annual performance reviews for his employees. As part of the reviews, Kelley assigned integrated performance scores (IPS) to his direct reports. IPS ratings range from 0.00 to 2.00, and managers must ensure that all employees' scores balance to 1.00 on a scale. There is a "fixed pool of resources" and IPS ratings are used to determine distribution of "executive incentive compensation package[s]," including bonuses and shares of stock. Kelley said that after he made recommendations, minor changes to IPS ratings were common.

Kelley gave positive performance reviews to two of his employees, Robert Thornton and Daniel Tulcan. He suggested IPS ratings within the range demonstrating that each had made an impactful contribution to Boeing. Brian Baird was Kelley's supervisor and is another party to this case. Baird and a group of other Boeing vice presidents reviewed and lowered Tulcan's and Thornton's IPS ratings, which affected their bonuses. At the time of the decision-making, Boeing knew that it might layoff both Thornton and Tulcan. Kelley thought that Baird had

2

lowered IPS ratings for Thornton and Tulcan, and believed this change went against Boeing policy. In March 2018, Thornton and Tulcan complained about the changed scores. An investigation into their compensation occurred, in which Kelley "provided truthful information."

Following an incident occurring in March 2018, Boeing employee Kevin McCarry made a complaint about Kelley to Ethics. McCarry worked for Boeing on an assignment in Belgium. The investigation, conducted by Brandi Bateman, found that Kelley and McCarry had a phone call on March 29, 2018, in which Kelley asked McCarry to cancel a vacation in order to visit a supplier in Germany. McCarry refused. Kelley then contacted McCarry's manager to have McCarry "repatriated." McCarry took his vacation, but spent two days of his planned vacation onsite with the supplier.

In June 2018, Boeing considered Kelley the incumbent candidate to lead the new Enterprise Supplier Performance Organization. However, people involved in the decision stated that Kelley's recent leadership issues and the investigations around his behavior eliminated him as their choice for the role. The position went to another candidate.

In July 2018, Bateman completed her investigation into the incident between McCarry and Kelley. The report states that Kelley denied having a phone conversation with McCarry where Kelley requested that McCarry cancel his vacation. However, McCarry's phone records showed a call between them on the day in question that lasted over eight minutes. In his deposition, Kelley affirmed that they talked on the phone, but denied again that he requested that McCarry

3

cancel his vacation. But, the report found that after the phone call, Kelley threatened to repatriate McCarry.

Also in July 2018, Boeing investigator Robert Fasold completed his investigation into Wolfe's second ethics complaint. He turned in a draft report finding Wolfe's allegations to be unsubstantiated. In August 2018, Boeing reassigned the Wolfe case to Investigator Kathy Cho stating that Cho had more experience in Equal Employment Opportunity claims. Cho's investigative report was completed in August 2018. Cho found that Kelley made negative comments to Wolfe about contacting Ethics, and that he inferred that Wolfe's career could be impacted if she complained again. The report contained no recommendations or outcomes for Kelley, only findings.

In August 2018, following these investigations, the Boeing Employee Corrective Action Review Board (ECARB) met to "consider possible corrective action" for Kelley. ECARB was comprised of five senior Boeing employees. It reviewed the Wolfe and McCarry investigations, and heard from investigators Cho and Bateman, who stated that they questioned Kelley's honesty throughout the investigations. The ECARB decided to terminate Kelley based on three violations of Boeing policy and his not being completely honest during the investigation. Multiple ECARB members stated that Kelley's involvement in the IPS ratings investigation was not a factor in Kelley's termination.

Kelley believed that Boeing leadership retaliated against him for participating in the compensation investigation regarding Tulcan's and Thornton's IPS ratings. He sued Boeing and Baird in King County Superior Court for wrongful

4

discharge, breach of implied contract, justified reliance and estoppel, and for retaliation under the equal pay act, chapter 49.58 RCW.[2]  Boeing moved for summary judgment, and the trial court granted summary judgment in favor of Boeing.  Kelley appeals the order granting summary judgment.

## DISCUSSION

### I.  Standard of Review

The standard of review for summary judgment is de novo.  Martin v. Gonzaga Univ., 191 Wn.2d 712, 722, 425 P.3d 837 (2018).  Reviewing courts find summary judgment appropriate if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law.  Scrivener v. Clark Coll., 181 Wn.2d 439, 444, 334 P.3d 541 (2014) (citing CR 56(c)).  When reviewing a summary judgment appeal, "we consider all facts, and make all reasonable factual inferences in the light most favorable to the nonmoving party."  Id.

### II.  Tort of Wrongful Discharge

Most employment agreements allow either the employer or employee to terminate the contract "at will."  Dicomes v. State, 113 Wn.2d 612, 617, 782 P.2d 1002 (1989).  However, Washington applies a "public policy" exception to the at will doctrine.  Id.  An employee has a "cause of action in tort for wrongful discharge if the discharge of the employee contravenes a clear mandate of public policy."  Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 232, 685 P.2d 1081 (1984).

---

[2] Boeing removed this case to federal court and filed a motion to dismiss, which the court denied.  Kelley v. Boeing Co., No. 2:18-cv-01808-RAJ, 2019 WL 4139277, at *2 (W.D. Wash. Aug. 30, 2019).  The case was remanded back to King County Superior Court, where Boeing filed another motion to dismiss, which was again denied.  Id. at 1.

To create a prima facie case for wrongful discharge, the plaintiff must show that they: (1) expressed or exercised a statutory right; (2) the employer fired the employee; and (3) there was a causal connection between the employee's exercise of their rights and the discharge. Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wn.2d 46, 68, 821 P.2d 18 (1991).

Courts look to four situations in determining whether an employee expressed or exercised a statutory right. Becker v. Cmty. Health Sys. Inc., 184 Wn.2d 252, 258-59, 359 P.3d 746 (2015). These four situations include whether an employee (1) refused to commit an illegal act; (2) performed a public duty; (3) exercised a legal right or privilege; or (4) was retaliated against for reporting employer misconduct, also referred to as "whistleblowing."[3] Id.

When an employee alleges a wrongful termination claim under one or more of these scenarios, they have the burden to establish a prima facie case. Martin, 191 Wn.2d at 725. The prima facie case needs to show that their "'discharge may have been motivated by reasons that contravene a clear mandate of public policy.'" Id. (quoting Thompson, 102 Wn.2d at 232). A clear mandate of public policy is "'one of law'" and can be demonstrated by "'prior judicial decisions or constitutional,

---

[3] If the alleged wrongful discharge does not fall neatly into one of these four scenarios, courts run a more refined four-factor Perritt analysis. Becker, 184 Wn.2d at 259 (citing HENRY H. PERRITT, JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES § 3.7 (1991)). However, if a plaintiff clearly argues their wrongful discharge fits within one of these scenarios, courts do not apply the Perritt analysis. See Becker, 184 Wn.2d at 259 (finding plaintiff pleaded a cause clearly arguing a discharge in violation of public policy.) Kelley briefly mentions the Perritt test, but does not argue it applies, or lay out arguments under Perritt's four-factor test. Because Kelley argues that he was fired in violation of a public policy, we do not apply the Perritt analysis.

statutory, or regulatory provisions or schemes.'" Martin, 191 Wn.2d at 725 (quoting Dicomes, 113 Wn.2d at 617). If the employee shows a violation of public policy, the burden shifts to the employer to produce evidence showing a legitimate, nonpretextual and nonretaliatory reason for the discharge. Martin, 191 Wn.2d at 725-26. If the employer shows sufficient evidence, the burden shifts back to the employee to show a pretextual reason for the firing, or, if the employer's reason is legitimate, to show that the public policy conduct was a substantial factor in the employer discharging the worker. Id.

### III. Discharge in Violation of Public Policy

Kelley argues that the trial court erred in ordering summary judgment. He claims he took protected action in cooperating with an internal investigation regarding Boeing's policies when it lowered Thornton's and Tulcan's IPS ratings. He believes that this was regarded as objecting to an unfair wage practices. He alleges that these actions protected him from wrongful termination. To prevail on a claim of wrongful discharge due to the exercise of a legal right, Kelley must first show that his firing violated a clear mandate of public policy. Martin, 191 Wn.2d at 723. Kelley asserts he was wrongfully discharged because of two actions. First, he argues that he was terminated for speaking up in an internal investigation on behalf of his employees who were denied expected bonuses. Second, he argues that he was terminated for reporting that Baird violated Boeing's internal policies and lowered the IPS ratings on two employees who were scheduled for lay off.

7

Kelley argues that public policy exists to support his claim under six different Washington statutory schemes.[4,5,6] We analyze in turn each statutory scheme that Kelley alleges creates a public policy that supports his claim.

A. Chapter 49.12 RCW: Industrial Welfare

Kelley alleges that chapter 49.12 RCW applies here. This chapter generally concerns industrial welfare claims related to health, which is governed by the Department of Labor and Industries (DLI). See RCW 49.12.010, .033. DLI has the power to enforce all laws under chapter 49.12 RCW. RCW 43.22.270(4).

---

[4] Kelley also implies, but does not directly argue, that Kelley participating in this wage investigation constitutes whistleblowing. The first step in a whistleblower analysis under wrongful discharge is determining a public policy. Martin, 191 Wn.2d at 725 (analyzing first whether motive for discharge contravened a clear mandate of public policy). Because we find no public policy applies, we do not review Kelley's claims under the remaining whistleblower steps.

[5] In the complaint, Kelley cited to a number of federal laws to argue that they implicitly apply, but he does not make the same argument on appeal. Because he does not raise this issues on appeal, we do not review it. RAP 12.1 ("The appellate court will decide a case only on the basis of issues set forth by the parties in their briefs.").

[6] Kelley also argues that two prior rulings, established that a public policy exists to support his claim. However, Kelley cites to only one ruling, so we discuss only the ruling that he cites to. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (refusing to consider claims not supported by reference to the record) (citing RAP 10.3(a)(5)). In the federal court ruling, the court found that Baird had pleaded enough to survive a motion to dismiss. Kelley, 2019 WL 4139277, at *2. A motion to dismiss has different standards than a motion for summary judgment. See Karstetter v. King County Corr. Guild, 193 Wn.2d 672, 677, 444 P.3d 1185 (2019) ("[A motion to dismiss] is warranted only if we conclude that the plaintiff cannot prove any set of facts justifying recovery."); Martin, 191 Wn.2d at 722 (stating that summary judgment can be granted when the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law). Kelley does not cite legal authority showing that a decision in a previous motion to dismiss governs a de novo ruling on appeal. Kelley fails to provide support that a prior ruling on a motion to dismiss creates a public policy issue on a ruling of summary judgment. If a claim is not supported by any citation to authority, we do not consider it. Cowiche Canyon, 118 Wn.2d at 809 (citing RAP 10.3(a)(5)).

Kelley did not report any issue regarding Tulcan or Thornton to any government agency. Because Kelley did not participate in an investigation with the DLI, chapter 49.12 RCW does not apply.

B. Chapter 49.32 RCW: Injunctions in Labor Disputes

Chapter 49.32 RCW applies to "concerted activities for the purpose of collective bargaining or other mutual aid or protections." RCW 49.32.020. Engagement in concerted activity, even engagement by nonunionized workers, can show a public policy to create a wrongful termination claim. See Bravo v. Dolsen Cos., 125 Wn.2d 745, 752, 758, 888 P.2d 147 (1995); Briggs v. Nova Servs., 166 Wn.2d 794, 803, 213 P.3d 910 (2009). Courts differentiate between actions that constitute concerted activity, which are protected by the statute, and actions that are managerial decisions, which are not protected by the statute. See Briggs, 166 Wn.2d at 803. "Managerial decisions" include the "wisdom of company practices," including making entrepreneurial decisions, running the business, and hiring and firing employees. Id. at 804. By contrast, "concerted activities" include engaging in activities relating to "'terms and conditions of employment.'" Id. at 803 (quoting RCW 49.32.020).

Kelley argues that he participated in concerted activities on behalf of other employees, including advocating for Thornton and Tulcan against the wrongful withholding of their wages. Kelly implies that his situation is different from Briggs, as that case held that managerial decisions encompassed hiring and firing decisions. In Briggs, the court determined that letters from managers to the company's board of directors contained complaints about managerial decisions,

not terms and conditions of employment. Id. at 805-06. The first letter "addressed the Managers' dissatisfaction with director Brennan's performance in the areas of leadership, administration, finance, board development, corporate culture, and community and government relations." Id. at 799. The second letter addressed the recent firing of two of the eight employees who had written the first letter. Id. at 805. The court described the first letter's list of objections as a "near-perfect equivalent to the United States Supreme Court's references to complaints about 'managerial decisions, which lie at the core of entrepreneurial control,' a category that Court held wholly excluded from the definition of 'terms and conditions of employment.'" Id. (quoting Ford Motor Co. v. Nat'l Labor Relations Bd., 441 U.S. 488, 498, 99 S. Ct. 1842, 60 L. Ed. 2d 420 (1979)). The court concluded the complaints about managerial decisions were not concerted activity, and not protected by chapter 49.32 RCW for purposes of wrongful discharge. Briggs, 166 Wn.2d at 798, 806.

At Boeing, bonuses were allocated from a fixed pool of funds. Kelley, as a director, determined the IPS ratings of his direct reports. Baird and other vice presidents then compared Kelley's allocation with the allocations of other managers. Kelley complained about Baird's modification of the discretionary IPS rating Kelley had originally indicated. Kelley is in a clear managerial role, making discretionary managerial decisions just as Baird did when he and the other vice presidents revised those IPS ratings. Determining and allocating IPS ratings as performed by Kelley and Baird pertain more to running the business rather than the terms and conditions of employment, and it falls squarely under managerial

decision-making. Further, there is no evidence that the second level of discretion performed by the vice presidents was illegal or violated any Boeing policy.[7] This managerial behavior does not constitute concerted activity. Kelley fails to establish that Boeing violated the public policy of chapter 49.32 RCW when firing him.

C. Chapter 49.46 RCW: Minimum Wage Requirements and Labor Standards

Kelley argues that his complaint to Boeing that Tulcan and Thornton did not receive their suggested bonuses constitutes a wage claim under chapter 49.46 RCW. He argues the chapter should be liberally construed to include bonuses as protected wages.

"RCW 49.46.100 prohibits employer retaliation against employees who assert wage claims, and we have held employers who engage in such retaliation liable in tort for violation of public policy under this provision." Hume v. Am. Disposal Co., 124 Wn.2d 656, 662, 880 P.2d 988 (1994). Courts have held contractual bonuses are wage claims. See Flower v. T.R.A. Indus., Inc., 127 Wn. App. 13, 35, 111 P.3d 1192 (2005) (finding bonus provision in employment contract was wages); Durand v. HIMC Corp., 151 Wn. App. 818, 831, 214 P.3d 189 (2009) (finding percentage bonus guaranteed in contract wrongfully withheld). Following Flower and Durand, an employee asserting a wage claim over a contractual bonus may be protected by this statute.

---

[7] Kelley alleges that "Baird did not have the right, under Boeing policy, to change [performance management] ratings for employees that reported to Kelley." However, Kelley also admitted that changes to IPS ratings after he submits recommendations are common.

Here, Kelley was not making a wage claim on his own behalf. And, he does not assert or provide legal argument to support that chapter 49.46 RCW protects a manager complaining on behalf of an employee. Bonus amounts for Tulcan and Thornton were not guaranteed in their contracts; they were discretionary decisions of management. Neither chapter 49.46 RCW nor the cases cited by Kelley support his claim of a violation of a public policy protection.[8]

D. Chapter 49.48 RCW: Wages—Payment—Collection

Kelley cites to chapter 49.48 RCW to argue that Boeing withheld wages owed to Tulcan and Thornton. Chapter 49.48 RCW covers different types of wage claims. For example, RCW 49.48.010 applies to employers failing to pay their employees at the end of a pay period, RCW 49.48.030 concerns attorney fees, and RCW 49.48.060 contains protections for complaints to DLI. However, the only specific provisions in this chapter that Kelley cites to are the definitions, the penalties, and attorney fees. Kelley does not identify any provisions or any public policy protections in this chapter that apply here.

E. Chapter 49.52 RCW: Wages—Deductions—Contributions—Rebates

Kelley infers that chapter 49.52 RCW creates a public policy protection because Boeing failed to pay Tulcan and Thornton their promised wages as a result of lowering the IPS ratings he had given them. RCW 49.52.050(2) states that an employer cannot withhold wages obligated under "any statute, ordinance, or contract." Kelley does not show that Boeing was obligated to pay the bonuses

---

[8] We do not foreclose the possibility that this chapter could protect third-party wage complaints or discretionary bonuses in some situations.

to Tulcan and Thornton under statute, ordinance, or contract. Even with their evaluation scores lowered, both Tulcan and Thornton received bonuses. Kelley fails to show that Boeing was contractually obligated to pay Tulcan and Thornton higher bonuses.

     F.  Chapter 49.58 RCW: Washington Equal Pay and Opportunities Act

Kelley argues that RCW 49.58.050 protects him from retaliation by firing him. The stated intent of chapter 49.58 RCW is equal pay, as there "continues to be a gap in wages and advancement opportunities among workers in Washington, especially women." RCW 49.58.005(1). Kelley has not alleged any issues with equal pay or wage discriminated against anyone due to sex or gender.

None of the six statutory schemes relied on by Kelley provide a public policy protection for the actions Kelley took in this case.

  IV. Breach of Implied Contract

Kelley alleges that he signed a Boeing code of conduct.[9] In the original complaint, he argues that this created an implied contract between him and Boeing which altered his at will employment and prohibited Boeing retaliating against him. The Boeing code of conduct is a one page document that covers topics such as conflicts of interest, following applicable laws, and reporting illegal or unethical conduct. It also states "Retaliation against employees who come forward to raise genuine concerns will not be tolerated."

Generally, an employee manual or handbook can alter at will employment. Drobny v. Boeing Co., 80 Wn. App. 97, 101, 907 P.2d 299 (1995). However, if the

---

[9] Kelley did not provide any evidence that he signed the code of conduct.

13

manual or handbook includes only general policy statements rather than specific circumstances or specific situations, it does not create an implied contract.[10] Id. Whether an employer has made a specific promise is a question of fact. Id. But, if reasonable minds could not differ in resolving the issue, then a trial court may determine whether a contract promises specific performance as a matter of law. Id. at 101-02.

In Quedado v. Boeing, this court reviewed whether or not the Boeing code of conduct promised specific treatment in specific circumstances to an employee. 168 Wn. App. 363, 370, 276 P.3d 365 (2012). In that case, Boeing demoted Quedado, who alleged that the demotion violated the code of conduct. Id. at 369-70. This court held that the code did not extend specific promises to employees for specific situations. Id. at 370-71. We noted in that case, "Boeing's code was likely intended to foster a general 'atmosphere of fair treatment' for Boeing employees. . . . But such an 'atmosphere' is not enough to modify the at-will relationship." Id. at 371 (citation omitted). The Boeing code of conduct statement about retaliation fosters this atmosphere of fair treatment but does not create an implied contract. Without establishing express promises that have been violated, Kelley cannot sustain his breach of contract claim.

---

[10] Showing that an employee agreement contains specific circumstances is also the first step in an equitable reliance claim. Quedado v. Boeing Co., 168 Wn. App. 363, 368-69, 276 P.3d 365 (2012). Kelley brings a justifiable reliance claim in his complaint, but because he fails to show that the Boeing code of conduct is more than a generalized document, we do not continue with the equitable reliance analysis.

## V. Conclusion

Kelley fails to state a prima facie claim for the tort of wrongful discharge or for retaliation. Summary judgment was properly granted. Kelley's request for attorney fees is denied.

We affirm.

_Appelwick, J._

WE CONCUR:

_Andrus, A.C.J._          _Mann, C.J._